Magdaleno V. RODRIGUEZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 62274.

Court of Criminal Appeals of Texas,
En Banc.

March 5, 1980.

Rehearing Denied April 16, 1980.

---

Thomas Rocha, Jr., San Antonio, for appellant.

Bill M. White, Dist. Atty., Charles T. Conaway, Teofilo Chapa and Douglas V. McNeel, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ODOM, Judge.

This is an appeal from a conviction for capital murder. After the jury returned affirmative answers to the issues submitted under Art. 37.071, V.A.C.C.P., at the punishment stage, punishment was fixed at death.

In his first ground of error appellant attacks the grand jury selection method used to select the grand jury that returned his indictment.

In his argument under this ground of error appellant recognizes that the preliminary issue he must confront is the requirement of *Muniz v. State*, Tex.Cr.App., 573 S.W.2d 792, that challenges to the composition of the grand jury must be raised at the earliest opportunity. Referring to Art. 19.-27, V.A.C.C.P., the Court in *Muniz* wrote:

"This statute has been interpreted to mean that the array must be challenged at the first opportunity, *Valadez v. State*, Tex.Cr.App., 408 S.W.2d 109, which ordinarily means when the grand jury is impaneled. Challenge at this early date is sometimes impossible as when the offense occurs after the grand jury is impaneled. When challenge on impanelment is not possible, the array can be attacked in a motion to quash the indictment before trial commences. *Ex parte Covin*, 161 Tex.Cr.R. 320, 277 S.W.2d 109. If the defendant has an opportunity to challenge the array when it is impaneled and does not do so, he may not challenge it at a later date. *Armentrout v. State*, 138 Tex.Cr.R. 238, 135 S.W.2d 479."

In an effort to distinguish *Muniz*, appellant argues that he was not indicted by the first grand jury impaneled after he was arrested and charged in this case, and that had he challenged that first grand jury "he would have been told that he was premature and thus he would have been required to prognosticate that the July 1977 grand jury would have been the one indicting him and thus the one to be challenged." The purpose of a challenge to a grand jury is not dependent upon knowing that the particular grand jury *will* consider the case of the challenging accused; the purpose is to prevent the challenged grand jury from considering his case. If no timely challenge is raised to the composition of the grand

jury, it is presumed the accused had no ground for objection, and he is barred from raising a challenge at some later time that he should and could have raised in a timely fashion.

■ In the table of events in appellant's brief he concedes that he had been arrested and charged in this offense, and was represented by counsel, long before the grand jury that indicted him was impaneled. We find, as we did in *Muniz*, that appellant's failure to challenge the grand jury by a timely motion waived his right to make such a challenge. The ground of error is overruled.

In his second ground of error appellant asserts he is entitled to a new trial because the State violated an order on his motion for discovery by failure to disclose police offense reports of prior convictions. We initially note that his brief does not direct us to where the order on his motion may be found in the record, and our own examination of the instruments filed in the case and of the docket sheet does not disclose the existence of such an order.

■ During the course of a lengthy discussion of the offense reports, however, it appears that his motion for discovery of his police records had been granted prior to trial. Assuming the motion was granted, we point out that it has frequently been held that police reports are within the express exception from pre-trial discovery under Art. 39.14, V.A.C.C.P. *Brem v. State*, 571 S.W.2d 314; *Holloway v. State*, Tex.Cr. App., 525 S.W.2d 165; *Sheldon v. State*, Tex.Cr.App., 510 S.W.2d 936; *McCloud v. State*, Tex.Cr.App., 494 S.W.2d 888; *Powers v. State*, Tex.Cr.App., 492 S.W.2d 274; *Bradshaw v. State*, Tex.Cr.App., 482 S.W.2d 233; *Hart v. State*, Tex.Cr.App., 447 S.W.2d 944. Since the appellant was not entitled to pre-trial discovery of the police reports, no error is shown.

■ To the extent that appellant argues the State improperly suppressed the report in violation of his constitutional rights, we point out, as was stated in *Young v. State*, Tex.Cr.App., 552 S.W.2d 441, relying on *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), that one essential component in consideration of a claim of prosecutorial suppression of evidence is that "the evidence's favorable character for the defense must be shown." Appellant makes no assertion that the undisclosed offense reports are of a favorable character for the defense.

■ The dissent takes the position that *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), was violated in this case. The situation here is not at all like that in *Gardner*. The holding in that case was:

"We conclude that petitioner was denied due process of law when the death sentence was imposed, at least in part, on the basis of information *which he had no opportunity to deny or explain*." (Emphasis added.)

In *Gardner*, the defendant and his attorney were *never* informed of part of the information upon which the decision to impose the death penalty was based. Even *after* the trial was over and *after* the punishment was assessed, that information was not disclosed. The dissent's reliance on *Gardner* is misplaced. The testimony about which appellant complains was presented in open court and in his presence.

Finally, when, after lengthy discussion and argument between the attorneys over the use of the offense reports, objection was first raised on the basis of violation of the discovery order, appellant moved for a mistrial, but did not request a postponement or continuance under Art. 29.13, V.A.C.C.P., on the basis of surprise. This default alone would waive any error urged on the basis of surprise. See, *Hays v. State*, 117 Tex.Cr.R. 205, 36 S.W.2d 1029, 1031.

The second ground of error is overruled.

In his next three grounds of error appellant complains of the use made by the State of the three offense reports referred to in the previous grounds of error.

■ During the punishment phase of the trial the State called Dr. Grigson, who testified that appellant was a severe sociopath

who would commit criminal acts of violence in the future. On extensive cross-examination appellant's counsel asked about the basis for that conclusion, and inquired at length into what acts of violence in appellant's past had been relied on by the doctor in making his determination.[1] It was then on redirect examination that the com-

---

1. The extent to which the defense went into this subject on cross-examination is revealed by the following excerpt:

"Q. —would you refer to your notes and put at the top of the scale *the shooting of* February 8, 1977, and then trace back down the other violent acts which have occurred?

"A. Yes, sir, I will.

"Q. Don't read us the report. Just mark *down shooting, maiming, knifing, whatever you* have as far as violent acts.

"A. Yes, sir. Murder. Let's see. Attempt to kill, disruption and fights.

"Q. Well, now, give us the date on which this attempt to kill was supposed to have happened.

"A. Yes, sir. This was February the 10th, 1976, at the age of—I think he was 16 years old at that time. Using a butcher knife. Attempt to kill.

"Q. Tell us whether or not he stabbed somebody.

"A. I don't have that report, sir.

"Q. So you can't say that?

"A. No, I don't know whether he did or not. I really don't.

"Q. Doesn't that really say that he was chasing somebody with a butcher knife?

"A. No, sir, it doesn't. It says that he attempted to kill another student. Let's see. Prohibitive weapon—carrying a prohibitive weapon, January the 30th—I'm sorry. January the 31st, 1976. That was—we're going backwards, so January the 31st, 1976, where he was carrying a prohibitive weapon.

"Q. What was that weapon?

"A. I don't know, sir. I don't have that report.

"Q. It could have been a three-inch knife then?

"A. Something that was prohibitive. I assume it was something that was dangerous.

"Q. Show me where—show me where that, in itself, is a violent act.

"A. Well, it's against our laws.

"Q. I understand that, but you're talking about violent acts.

"A. Yes, sir.

"Q. I understand that a shotgun may be a dangerous weapon, but a lot of people go out hunting with them.

"A. Yes, sir. But if you carry it into a bar, it's different.

"Q. Well, does it say that he carried it into a bar?

"A. No. I'm just saying compared to going hunting as compared to going into a bar. They'll put you in jail for it.

"Q. Well, we're speaking specifically—

"A. Yes, sir.

"Q. —about previous violent acts, acts of violence.

"A. Yes, sir.

"Q. So scratch that 31 January, '76.

"A. Well, I consider that violent, for a—again, a 16-year-old to be carrying around a prohibitive weapon. I would consider that an act of violence.

"Q. You're basing your opinion upon what? It doesn't tell you what kind of a weapon it was, does it?

"A. It was against the law.

"Q. Where is the violent act there?

"A. Well, the result—

"Q. I understand the illegal act, but tell me where *the violent act is.*

"A. I would consider that violent sir, for a 16-year-old to be carrying a prohibitive weapon when he's on parole. That would be violent to me.

"Q. A violent act, doesn't that denote and connote actually committing something?

"A. Well, that would be about like somebody saying, 'I'm going to kill you.' That would be a violent act to me.

"Q. No, that's a threat.

"A. Well, that's a violent act. From a psychiatric and medical standpoint, I would consider it violent.

"Q. All right. Well, let's go back. The jury can interpret whatever they want from what you're saying.

"A. Yes, sir.

"Q. The fact is that from you're reading it simply says, 'Carrying a prohibitive weapon.'

"A. Yes, sir. it does. And then—let's see. We go back to August the 27th 1974. At that time, it was burglary. We go back to—

"Q. Now, is there anything in there to indicate that anyone was hurt, injured, or property damaged or anything like that?

"A. I don't know what happened sir. I just have burglary. Then, July 28th, 1973, burglary. Then—let's see.

"Q. What age was he at that time?

"A. He was 14 years old in 1973. Then, in 1969, at the age of 10—well, wait a minute. Before then, we have got, at age 13, he had a burglary and paint sniffing. At the age of 10, malicious mischief. That was 1959. Now, there's other—

plained of offense reports were used to inquire further into the basis for the doctor's opinion. We hold the cross-examination by appellant on this subject opened the door under Art. 38.24, V.A.C.C.P., for the State to inquire further into the same subject.

Even though the dissent on its own initiative argues unreliability, appellant has made no attempt to show, by motion for new trial or otherwise, that the information received by the jury was in fact unreliable. Instead, the entire thrust of appellant's tactic in opening up this subject was to chal-

"Q. It must be '69.

"A. 1969, yes, sir. That was malicious mischief at the age of 10. There's other fights that are reported, but it doesn't give the dates. Of course, his drug abuse; but there again, I don't have a specific date there. There was an auto theft which they have listed here, but I don't know when that occurred. There's an escape. I don't have any dates on that.

"Q. Escape? You mean running away from the state school for juvenile delinquents, right?

"A. Let's see. They just have it listed as escape. I don't really—I assume that's where he escaped from, but I don't really know. I think that's the only—that's the only thing that I have here at this time.

"Q. You made some reference to fights. These were fights when he was 10, 12, 13 years old; somewhere along there?

"A. I don't know at what ages. It didn't list them.

"Q. I would like for you to look back upon the information that's on the board and tell me—or chart—tell me exactly how many of those cases you can say—so that we all understand English the same way—involved the actual use of violence or the actual use of violent force such as to cause an injury, other than the murder.

"A. Yes, sir. Well, again, from a psychiatric medical standpoint, I consider it an act of violence for somebody to steal my car. I don't know what the malicious mischief was at the age of 10. It never resulted in charges, apparently. The burglary certainly, I think—I see that as being a violent act against my property. The escalation up the ladder to the point of carrying the concealed weapon or prohibitive weapon, then the attempt to kill, and then the murder—you see a very very definite escalation starting with age 10 and proceeding right on up to, I guess, the worst crime that one can commit.

"Q. All right. But you have reached the conclusion that carrying a prohibitive weapon was a violent act without any more information as to whether it was a switchblade knife, a hunter's knife, a machette, a pistol, or anything else?

"A. Well, it was sufficient enough, while he was on parole, for them to send him back. So I would consider that it was not like perhaps your son going out hunting and carrying a

hunting knife, or even going hunting with a shotgun. I would consider that it was severe enough that they again put him back into Gatesville. So it was not a minor type violation I don't think.

"Q. But we don't know what it was? Or do you know? If you do, I would like for you to tell us.

"A. No, I don't know what kind of weapon it was, other than it was, again, severe enough where they put him right back in there again.

"Q. Well, doesn't the report from Gatesville say that they kept him in and out of Gatesville anyway?

"A. They kept him in and out?

"Q. Yes, they took him in and sent him back out.

"A. Yes, sir, they did.

"Q. And doesn't the report say that they recommended further retention and institution because his behavior improved as he was institutionalized?

"A. They recommended further institutionalization because he had improved?

"Q. Yes, as a form of therapy. Or did you not read that in the report?

"A. I don't recall it stating in that. I recall them stating that they thought he had improved, but obviously they had made a mistake. They were wrong, it said. Yes, it states there on—well, I don't have a page number, but it's right above his past medical record. It stated that he was doing well and would be replaced in the 11th grade, but did not desire to return to school upon release. 'Apparently the Defendant has not adjusted as well as one would like since his release.' And he was ultimately booked into the Bexar County Jail on 2/24/77, for the offense of capital murder.

"Q. Do you have in your possession a letter from James H. Smith, the consulting psychiatrist from the Texas Youth Council?

"A. No, sir, I don't.

(Whereupon, Defendant's Exhibit Number 1 was marked for identification.)

"Q. I'm going to show you what's been marked for identification as Defendant's Exhibit Number 1 and see if you have seen it, a copy of it, or any reports from that particular psychiatrist.

"A. No, sir, I haven't. It was summarized or included in Dr. Cameron's report, but I have not seen this specific report itself."

lenge the reliability of Dr. Grigson's conclusions through examination of what information he used to reach those conclusions. See footnote 1, above. It should reasonably have been expected that such a tactic could have opened a Pandora's box. These grounds of error are overruled.

■ Next appellant challenges the constitutionality of the Texas death penalty scheme. Such attacks have been repeatedly rejected by this Court. *Jurek v. State*, Tex. Cr.App., 522 S.W.2d 934, affirmed 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929; *Smith v. State*, Tex.Cr.App., 540 S.W.2d 693; *White v. State*, 543 S.W.2d 104, 105; *Granviel v. State*, Tex.Cr.App., 552 S.W.2d 107; *Freeman v. State*, Tex.Cr.App., 556 S.W.2d 287; *Hughes v. State*, Tex.Cr.App., 562 S.W.2d 857. The ground of error is overruled.

■ Appellant also raises challenges to admission of the testimony of Dr. Grigson, on the theory that the psychiatric interview violated his privilege against self-incrimination. The brief, however, does not cite any trial objection, and our examination likewise reveals none. Nothing is presented for review. *Muniz v. State*, Tex.Cr.App., 573 S.W.2d 792.

■ Finally, it is argued that the trial court erroneously denied appellant's motion that prospective jurors be examined under the *Witherspoon*[2] criteria instead of under V.T.C.A., Penal Code Sec. 12.31(b). There is no contention, however, that examination of any prospective juror was restricted in this regard, nor that any prospective juror was dismissed in violation of the mandate of *Witherspoon*. The ground of error is overruled.

The judgment is affirmed.

PHILLIPS, Judge, dissenting.

In allowing this death sentence to stand, the majority sanctions a travesty of justice.

To justify this erroneous result, the majority employs reasoning that cannot withstand legal analysis.

Appellant's death sentence was based at least in part on completely unreliable evidence. At the punishment phase of his trial, the State's psychiatrist testified that appellant committed three extraneous offenses, all involving acts of force and violence. This testimony was hearsay upon hearsay, and its admission violated the United States Constitution in three separate ways. *See* the discussion *infra*.

The majority summarily overrules appellant's grounds of error concerning this testimony. Its sole justification is that defense counsel "opened the door" under Article 38.24, V.A.C.C.P. In invoking Article 38.24, the majority fails to consider the underlying rationale of this statute. In addition, the majority disregards the relationship between a state statute and the United States Constitution.

The purpose of Article 38.24 is to prevent the trier of fact from being misled. In the present case defense counsel did not try to mislead the jury; rather, the prosecutor tried to mislead defense counsel. The trial court granted appellant's motion for discovery of "[a]ll arrest records, police records, juvenile records, and records of convictions, if any, of the Defendant." The State failed to furnish any of these documents to appellant. As a result of the State's noncompliance, defense counsel mistakenly believed that his 17-year-old client had no history of serious violent behavior. When the State's psychiatrist testified that appellant "absolutely will . . . kill again," defense counsel tried to show that appellant's prior criminal conduct was not severe and therefore the psychiatrist's opinion was without basis. After defense counsel attempted to make this showing, the prosecutor used police offense reports withheld in violation of the discovery order to show that appellant had a history of serious

2. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776.

violent behavior.[1]  Both the existence and the contents of these reports totally surprised defense counsel.

Whatever merit trial by ambush may have in other contexts, it certainly has no place at the punishment phase of a capital murder trial, where the goal is a reliable determination of whether death is the proper punishment.  Here the State's misconduct led defense counsel to mistakenly believe that he was presenting to the jury the complete picture of appellant's past criminal behavior.  Where the trier of fact receives an incomplete picture on a certain subject because of the State's misconduct, the State should not be permitted to invoke Article 38.24 and thereby benefit from its own misconduct.  What occurred in the present case was manifestly unfair, and under such circumstances applying Article 38.-24 makes no sense.

Even if Article 38.24 is deemed applicable in the present case, *a state statute cannot authorize the admission of evidence in violation of the United States Constitution.*  As I will show, the admission of the psychiatrist's testimony concerning extraneous offenses violated no less than three of appellant's federal constitutional rights.

Even if the majority somehow finds that Article 38.24 overrides these three federal constitutional rights, this finding does not relieve the Court of its obligation "to promote the evenhanded, rational, and consistent imposition of death sentences under law." *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).  Nor does it relieve the Court of its obligation to ensure that appellant received a fair trial.  A review of the record in the present case makes it abundantly clear that appellant did not receive a fair determination on the issue of punishment.  At the punishment phase of his trial, the jury heard highly prejudicial hearsay evidence concerning many *unproven* extraneous offenses.  If the majority finds that defense counsel opened the door or otherwise waived all errors in the admission of this evidence, the conclusion is inescapable that appellant received ineffective assistance of counsel.[2]  Regardless of the legal theory, the death sentence in this case bears no indicia of reliability and should not be allowed to stand.  *See Jurek v. Texas*, supra; *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

In ignoring appellant's federal constitutional rights, the majority pursues a course that is at best unwise.  By forcing appellant into the federal courts where he ultimately will obtain relief, the majority imposes on taxpayers the needless expense of

1.  The majority correctly points out that the police offense reports were not discoverable under Article 39.14, V.A.C.C.P.  The majority is incorrect, however, in holding that the Due Process Clause requires disclosure only where "the evidence's favorable character for the defense [is] shown."  The United States Supreme Court has made it clear that in death penalty cases the right to disclosure extends to unfavorable evidence.  In *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Supreme Court found a denial of due process where the State failed to disclose apparently aggravating information relied on at the penalty stage in assessing the death sentence.

In the present case the State likewise failed to disclose aggravating evidence relied on at the punishment phase in assessing the death penalty.  Under the balancing test laid down in *Gardner v. Florida*, supra, and discussed *infra*, appellant was entitled as a matter of due process to disclosure of the police offense reports.  In accordance with that right, the trial court ordered the State to disclose these reports.

It reasonably can be assumed that the State had other records, besides the police offense reports, relating to the three alleged offenses, such as appellant's "rap sheet."  These other records were within the scope of the trial court's discovery order and were discoverable under Article 39.14 as well as the Due Process Clause.

2.  The defense attorney who represents appellant on appeal also represented appellant at trial.  The claim of ineffective assistance of counsel is not raised on appeal; nevertheless, this Court has considered the issue sua sponte.  *Vessels v. State*, 432 S.W.2d 108, 115 (Tex.Cr. App.1968, on Motion for Rehearing); *see Cude v. State*, 588 S.W.2d 895 (Tex.Cr.App.1979).

additional appeals. Moreover, while appellant's case is tied up for years in federal courts, memories fade and witnesses become unavailable, raising the possibility that upon retrial the State may be unable to obtain even a guilty verdict.

For the foregoing reasons and for the federal constitutional violations discussed below, I dissent.

At the punishment phase of the trial the State called Dr. James P. Grigson, a psychiatrist, to testify about the probability that appellant would commit future criminal acts of violence. Dr. Grigson testified that he examined appellant for a period of less than two hours, and during this time appellant for the most part refused to answer his questions.[3] Dr. Grigson further testified that he diagnosed appellant as having a "sociopathic personality disorder." He described a sociopath as a person without a conscience who has no feelings of guilt or remorse. He stated that sociopaths repeatedly break the rules and are constantly in trouble. After explaining that this personality disorder varies in its severity, Dr. Grigson testified as follows:

> Q. Let me ask you whether or not you can place Mr. Magdaleno Rodriguez on that scale of sociopathic—
>
> A. Yes, sir, I can.
>
> Q. Where does he fit in your opinion?
>
> A. Mr. Rodriguez would be at the very end, at the very most severe. You cannot become any worse or any more severe than what he already is.

**3.** The following excerpts are from the testimony of Dr. Grigson:

> Q. Did you conduct the psychiatric examination you have outlined for us in connection with Magdaleno Rodriguez?
> A. I attempted to. I went through all the various different parts of the examination. He responded verbally, initially; and then, he stopped responding verbally and did occasionally respond with a nod of the head. But for the most part, he was quite uncooperative.
>
>     *    *    *    *    *    *
>
> Q. How long did you examine Magdaleno Rodriguez?

> Q. Does he have any regard for human life or property or other people's rights at all?
>
> A. He has regard for his own life or his own property, but he has complete disregard for another human being's property, or even for another human being's life. He doesn't have any regard for another human being's life.
>
> Q. Now then, the kind of personality disorder that he has, is there any treatment for it?
>
> A. No, sir. First, it's not a sickness. But there's nothing in the field of medicine, there's nothing in the field of psychiatry, there's nothing that our society knows of at this time, nor is there any expectation of being able to change or modify his behavior.
>
> Q. Can you tell us, based upon your examination of him and your experience as a psychiatrist, what future behavior he would engage in if given an opportunity?
>
> A. Yes, sir, I can tell you that.
>
> Q. What is that, please, sir?
>
> A. Well, his behavior can't get any worse. It will only continue as it has been in the past. So, the only difference you're talking about is in terms of numbers. Again, his behavior can't get worse. But he'll continue doing the same things which he has done in the past.

> A. I, of course, had reviewed the records prior to the time of seeing him; and then, oh, that morning, I would say somewhere around an hour. Then I saw him again that afternoon. It was for a briefer period of time, but I don't recall specifically how long.
>
>     *    *    *    *    *    *
>
> Q. Now, were you having difficulty communicating with him?
> A. I didn't have any difficulty in communicating with him. He just refused to answer questions.

Q. Can you tell us whether or not, in your opinion, having killed in the past, he is likely to kill in the future, given the opportunity?

A. He absolutely will, regardless of whether he's inside an institutional-type setting or whether he's outside. No matter where he is, he will kill again.

Q. Are you telling me, then, that even if he were institutionalized, put in a penitentiary for a life sentence— would he still be a danger to guards, prisoners, and other people around him?

A. Yes. He would be a danger in any type of a setting, and especially to guards or to other inmates. No matter where he might be, he is a danger.

Later the prosecutor asked Dr. Grigson about two extraneous offenses, an aggravated robbery and an aggravated sexual abuse, that previously had not been admitted into evidence. During this questioning the prosecutor handed the psychiatrist two police offense reports to refresh his memory.

Q. Now then, let me ask you whether or not you knew of his shooting anyone else other than the woman he killed. Let me ask you whether or not you considered, in arriving at your opinion about him, the incident in which he was in the course of robbing a Jiffy Mart Store and was in a shootout with the owner.

A. I was told that. I understand that shots were fired; that he didn't hit the owner, though.

Q. Yes, sir. Shot at him? Were you aware, in considering these two other —I'll show you the reports. Look at this and tell me, on 7/22/75—let's see.

A. July 22nd, 1975.

Q. '75, right. Now then, let me ask you whether or not, also in arriving at your opinion of him, you considered an incident in which he was involved in an aggravated sexual abuse case on 5/5/75.

A. Yes. That was May 5th, 1975.

After Dr. Grigson testified that he considered these two extraneous offenses in reaching his conclusions about appellant, the defense attorney made a timely request to inspect the two offense reports that the psychiatrist used to refresh his memory. Defense counsel examined the reports and then took Dr. Grigson on voir dire. Dr. Grigson admitted that he previously had not seen the two offense reports but had relied solely on statements of the prosecutor. Defense counsel had Dr. Grigson read the offense reports and then established through him that the offense report of the robbery at the Jiffy Mart on July 22, 1975, contained no mention of any shots being fired.

Q. So then, when you answered the Assistant District Attorney that you had considered that on 22 July, 1975, the Defendant had been involved in shooting at a clerk—

A. Yes, sir.

Q. What shooting were you referring to?

A. The one Mr. Conaway [the prosecutor] told me about.

Q. He says, "22 July, 1975," and that's what's marked on there. And you agreed with him.

A. Yes, sir.

Q. Could you tell me in there where it says that there was a shooting on the 22nd of July, '75?

A. There was nothing in this report that indicates there was a shooting; only an aggravated robbery.

Defense counsel further established that the offense report of the aggravated sexual abuse on May 5, 1975, was marked "unfounded" in two places on the bottom of the report.

Q. I'm going to ask you to examine the one of 5 May, '75, and read it at your leisure in its entirety.

A. Yes, sir. Yes, sir.

Q. Your answer is "Yes, it says that the report was unfounded," right?

A. It says, "I recommend that this case be unfounded."

MR. ROCHA: With the Court's indulgence, I would approach the witness.

Q. There's the word "unfounded" on the bottom of the report, on either side?

A. Yes, sir.

The defense attorney moved for a mistrial on several grounds and objected to any further testimony about extraneous offenses. His objections included the following: (1) the State failed to comply with the court's order to disclose all arrest records and police records of appellant, (2) the testimony about extraneous offenses was "a total and complete surprise," and (3) this testimony was inadmissible hearsay. The court overruled all motions for a mistrial, and in spite of defense counsel's strenuous objections, permitted Dr. Grigson to continue testifying about extraneous offenses.

The court allowed the psychiatrist to examine a third offense report. This report contained the details of an aggravated robbery involving a shoot-out that occurred on July 31, 1975. Dr. Grigson testified that he also relied on this extraneous offense in reaching his conclusions about appellant. This testimony of a third extraneous offense likewise surprised defense counsel.

Q. Dr. Grigson, just before we recessed, I was asking you to examine what's been marked for identification as State's Exhibit 24. Have you examined that, please, sir?

A. Yes, sir, I did.

Q. Let me ask you whether or not you considered it—not the paper itself, but the contents, what's related therein arriving at your opinions and conclusions as to Mr. Rodriguez.

A. Yes, sir, I did.

Q. And does State's Exhibit Number 24 relate that on the 31st of July of 1975, Mr. Magdaleno Rodriguez was involved in a robbery of a convenience store where he shot at a clerk?

A. Yes, sir, it does.

Q. Now, State Exhibit Number 22, the 22nd of July, '75, did not involved [sic] shooting at a clerk?

A. No, sir, it did not.

Q. We're talking about different robberies; is that correct?

A. Yes, sir, that is.

Q. Okay. So, actually, the 31st one was the one that involved shooting at a clerk; and the 22nd of July, that robbery did not involve shooting at a clerk?

A. No, just aggravated robbery.

Q. Armed robbery with a pistol?

A. Yes, sir.

The police offense reports never were admitted into evidence. In fact, other than Dr. Grigson's testimony, there was no evidence of the three extraneous offenses admitted at appellant's capital murder trial. In final arguments at the punishment hearing, the prosecutor argued that these extraneous offenses were evidence that appellant would commit future criminal acts of violence. Defense counsel objected on the ground that this argument was unsupported by the evidence, but this objection was overruled.

The admission of Dr. Grigson's testimony about three extraneous offenses violated three of appellant's federal constitutional rights. First, this testimony was a complete surprise to defense counsel and thereby violated due process. Second, this testimony was hearsay upon hearsay and denied appellant the right of confrontation. Third, this testimony was so unreliable as to violate due process.

The first issue is whether surprise to defense counsel so damaged the reliability of

appellant's punishment hearing that it constituted a denial of due process. This inquiry must begin with the United States Supreme Court cases discussing the reliability requirement in capital sentencing proceedings.

A majority of the Supreme Court has recognized the uniqueness of death as a punishment. *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). This recognition underlies the requirement that where the punishment is death rather than imprisonment, the sentencing decision must attain a much higher degree of reliability. *Gardner v. Florida*, supra; *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

> [T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. *Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.* [Emphasis added]

*Woodson v. North Carolina*, supra. This reliability requirement, first announced in *Woodson*, was later reaffirmed in *Gardner*.

In *Gardner* the Supreme Court reversed a death sentence because it was imposed partly on the basis of information not disclosed to defense counsel. Applying a balancing test, the Court found that "the interest in reliability," which disclosure of the information would have served, clearly outweighed the State's interest in withholding the information. Finding a denial of due process, the Court noted that defense counsel had "no . . . opportunity . . . to challenge the accuracy or materiality of [the] information."

Both this Court and the Fifth Circuit Court of Appeals have recognized that the interest in reliability suffers when evidence at a capital sentencing proceeding surprises the defense. *Garcia v. State*, 581 S.W.2d 168 (Tex.Cr.App.1979) (Roberts, J., concurring); *Smith v. Estelle*, 602 F.2d 694 (5th Cir. 1979) (petitions for rehearing and rehearing en banc denied). In *Smith*, supra, the court struck down a death sentence in a Texas case because at the penalty phase a psychiatrist's testimony relating to the second punishment issue surprised the defense. The *Smith* court compared the consequences of surprise in the case before it with the consequences of nondisclosure in *Gardner*. It concluded that surprise can be as effective as nondisclosure in preventing effective cross-examination and in denying defense counsel the opportunity to challenge the accuracy of the evidence. The *Smith* court found that as a result of the surprise psychiatric testimony, "[the] sentencing hearing was at least as unreliable as the proceedings in *Gardner*." It further found that the justifications for the unreliable procedures were far weaker in the case before it than they were in *Gardner*.

In the present case it is undisputed that Dr. Grigson's testimony about two aggravated robberies and an aggravated sexual abuse was a complete surprise to defense counsel. This surprise was compounded by the State's unorthodox method of introducing extraneous offenses through an expert medical witness. Although defense counsel attempted to challenge the accuracy of Dr. Grigson's testimony, the record reflects that this attempt was ineffective.

Notice of the intent to prove extraneous offenses clearly would have served the interest in reliability. When the balancing test dictated by *Gardner* is applied, this interest in reliability easily outweighs the State's interest in withholding such notice. As Judge Roberts so aptly stated in his concurring opinion in *Garcia*, supra:

> . . . Article 37.071 should not be construed as authorizing proof of unadjudicated, extraneous offenses if this comes as an unfair surprise to the defendant. Notice, a fundamental element of due process, must be provided. Allowing proof of unadjudicated, extraneous of-

fenses comes close to allowing one or more "prosecutions" of the defendant in the sentencing proceeding. Simple fairness requires that the defendant be given notice that the State intends to offer proof of unadjudicated, extraneous offenses, so that the defendant and his counsel can investigate and prepare a response. . . . [Footnotes omitted]

In the instant case appellant and his counsel had no opportunity to investigate and prepare a response to the testimony of extraneous offenses. Surprise prevented an effective response by defense counsel and thereby impaired the interest in reliability.

The Supreme Court's opinion in *Gardner* mandates a reversal in this case. Because the State failed to provide notice of its intent to prove extraneous offenses at the punishment phase, appellant's penalty hearing was at least as unreliable as the proceedings condemned in *Gardner* and *Smith*. Surprise so impaired the interest in reliability as to amount to a denial of due process.

The second issue is whether, absent surprise, Dr. Grigson's testimony of extraneous offenses denied appellant the right of confrontation. It is undisputed that Dr. Grigson's pretrial knowledge of the three extraneous offenses was based entirely on the prosecutor's statements to him. At trial this knowledge was supplemented by police offense reports. The record reflects that neither the prosecutor nor the authors of the offense reports had any firsthand knowledge of the three extraneous offenses. Thus, Dr. Grigson's knowledge of these offenses was at best thirdhand.

The inherent difficulties in effectively cross-examining a person with thirdhand knowledge are obvious, as the record in this case clearly shows. When defense counsel pointed out to Dr. Grigson that his testimony conflicted with the police offense reports, the psychiatrist's response was that he considered his source of information, the prosecutor, to be "a very noble and honorable man." Since Dr. Grigson's testimony was hearsay upon hearsay and did not bear the indicia of reliability sufficient to insure the integrity of the fact-finding process, the admission of this testimony violated appellant's right of confrontation. *Porter v. State*, 578 S.W.2d 742 (Tex.Cr.App.1979).

The third issue is whether, absent surprise, Dr. Grigson's testimony of extraneous offenses was so unreliable as to violate due process. As previously stated, the Supreme Court repeatedly has emphasized the interest in reliability at capital sentencing proceedings. *Gardner*, supra; *Woodson*, supra. Dr. Grigson's lack of firsthand knowledge necessarily raises questions about the reliability of his testimony, which also implicates the Due Process Clause. When testimony about extraneous offenses is based on second- and thirdhand knowledge, the risk of unreliability is extremely high.

In the present case defense counsel established that the thirdhand knowledge of Dr. Grigson conflicted with the secondhand knowledge of the police offense reports. The psychiatrist testified that on July 22, 1975, appellant was involved in a shoot-out during an armed robbery. Defense counsel showed, however, that the police report of this offense contained no mention of any shots being fired. Defense counsel also showed that the offense report of the aggravated sexual abuse was marked "unfounded" in two places on the bottom of the report.

Dr. Grigson's thirdhand knowledge of the three extraneous offenses and the conflict between his testimony and the police offense reports make his testimony concerning the extraneous offenses extremely unreliable. Besides the psychiatrist's testimony, there was no evidence admitted at appellant's trial to show either the commission of the extraneous offenses or appellant's involvement in them. *See Eanes v. State*, 546 S.W.2d 312 (Tex.Cr.App.1977); *Landers v. State*, 519 S.W.2d 115, 120 (Tex.Cr.App. 1974). His testimony was so unreliable and prejudicial that it deprived appellant of a fair determination on the issue of punishment. The admission of this evidence con-

stituted a denial of due process. *Gardner,* supra; *Woodson,* supra.

In its brief the State does not deny that admission of Dr. Grigson's testimony about three extraneous offenses was error. The State maintains, however, that this error was harmless because there was sufficient evidence other than the testimony of the three extraneous offenses to support the jury's verdict on the punishment issues.

The State's position is untenable. When confronted with errors of constitutional dimension, the proper question to ask is whether the errors are harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Dr. Grigson's testimony about two aggravated robberies and an aggravated sexual abuse was clearly damaging to appellant. It cannot be concluded with the required degree of certainty that the admission of this evidence failed to contribute to the jury's assessment of the death penalty.

At trial defense counsel failed to object to Dr. Grigson's testimony on the grounds that it denied the right of confrontation and was so unreliable as to violate due process. In addition, defense counsel's objections on the grounds of hearsay and surprise were not as timely as they could have been. The issue thus presented is whether defense counsel's failures constituted a waiver of the numerous errors involved in admitting Dr. Grigson's testimony.

There are four reasons why a waiver did not occur. First, the errors involved in admitting the testimony about the three extraneous offenses rendered the sentencing decision so unreliable that the admission of this evidence, even absent an objection, constituted reversible error. Second, defense counsel objected on the grounds of hearsay and surprise before any testimony about the third extraneous offense was admitted, thereby giving the trial court the opportunity to prevent further harm to ap-

pellant. In spite of this opportunity, the trial court overruled appellant's objections and permitted Dr. Grigson to testify about the third extraneous offense and to rehabilitate his testimony about the first extraneous offense. Third, the State's failure to comply with the court's discovery order and its failure to give notice of its intent to prove extraneous offenses caused Dr. Grigson's testimony to be a complete surprise to defense counsel. This surprise makes it somewhat understandable that defense counsel did not object as promptly and as thoroughly as he could have. *See Smith v. Estelle,* supra, at n. 19. Fourth, with respect to the constitutional errors, there is no basis for presuming that appellant himself made a knowing and intentional waiver, or that defense counsel made a tactical decision not to object.[4] *Gardner v. Florida,* supra. For these reasons defense counsel's failures did not constitute a waiver of the errors involved in admitting Dr. Grigson's testimony about the three extraneous offenses.

I dissent.

ROBERTS and CLINTON, JJ., join in this dissent.

---

**4.** Since defense counsel objected on a number of grounds to Dr. Grigson's testimony about extraneous offenses, there is no conceivable

tactical reason for failing to object to this testimony on additional grounds.