**Selwyn Barry GHOLSON and Larry Joe Ross, Petitioners-Appellees,**

v.

**W. J. ESTELLE, Jr., Director, Texas Department of Corrections, Respondent-Appellant.**

No. 79–3988.

United States Court of Appeals, Fifth Circuit.

May 14, 1982.

---

Anita Ashton, Douglas M. Becker, Asst. Attys. Gen., Austin, Tex., for respondent-appellant.

Jay Topkis, Ronald Meister, New York City, Court-appointed, for Gholson.

Barrington D. Parker, Jr., New York City, Court-appointed, for Ross.

Before DYER,* SAM D. JOHNSON and WILLIAMS, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

On March 5, 1975, defendants/appellees—Selwyn Barry Gholson and Larry Joe Ross—were convicted of capital murder by a jury in Bell County, Texas. Both men were sentenced to death. Their convictions were affirmed and they exhausted their state remedies.

On April 21, 1978, they petitioned the federal district court for a writ of habeas corpus to set aside the death sentences and the district court stayed defendants' executions. Defendants filed a motion for summary judgment, claiming, in part, that the state trial court had improperly admitted testimony of the prosecution's psychiatrists in violation of their constitutional rights. The district court held defendants' claims in abeyance pending this Court's decision in the case of *Smith v. Estelle*, 602 F.2d 694 (5th Cir. 1979).

Holding that the issues in *Smith v. Estelle* were closely related to the issues in the case *sub judice*, the district court granted defendants' motions for summary judgment. The district court found that each of the constitutional deficiencies found to exist in *Smith*—a denial of due process, deprivation of the privilege against self-incrimination, and deprivation of the right to counsel—existed in the case at bar. The district court set aside defendants' death sentences, but did not affect their convictions. The State of Texas appeals the district court's judgment. This Court affirms the district court.

I. *Facts*

Prior to trial, defendant Ross indicated he would rely on the defense of insanity. However, defendant Ross withdrew his insanity plea after the trial court granted the State's motion for a psychiatric examination of both defendants and appointed Dr. James P. Grigson, a psychiatrist, to examine defendants Gholson and Ross "for the sole purpose of the issue of sanity." The record indicates the only question to be answered was whether defendants were competent to stand trial. Ross withdrew his plea prior to being examined by Dr. Grigson. Defendant Gholson never raised the issue of sanity, and neither defendant raised any issue of competency to stand trial.

Dr. Grigson interviewed defendants on November 14, 1974. On January 18, 1975, another physician hired by the State—Dr. John Holbrook—examined defendants. Dr. Holbrook, a psychiatrist, examined defendant Gholson for one and a half hours and defendant Ross for one hour. While Dr. Holbrook had been employed by the State, neither defense counsel nor the trial court was informed that he had examined defendants.

* Circuit Judge of the Eleventh Circuit, sitting by designation.

No psychiatric testimony was introduced at the guilt-innocence phase of the trial. However, Dr. Holbrook was called by the State at the punishment phase of the trial and testified both defendants were sociopaths. Dr. Holbrook further testified their failure to demonstrate "remorse" during the interview indicated there was a probability they would commit criminal acts of violence in the future that would constitute a continuing threat to society. This testimony served as the foundation for the jury's determination that defendants should be sentenced to death, since, under Texas law, the jury must find a defendant probably would constitute such a future threat before the death penalty may be imposed.[1]

Defendant Gholson called as a witness a psychiatrist who had interviewed defendant Gholson on three separate occasions for three and one-half hours. This psychiatrist testified defendant Gholson was not a sociopath and probably would not commit future acts of criminal violence. The State then called Dr. Grigson to rebut defendant Gholson's doctor. Dr. Grigson had examined defendant Gholson for approximately one and a half hours. He testified that one of the characteristics of a sociopath is that such a person does not have a conscience or have feelings of guilt, shame, embarrassment, or remorse. Dr. Grigson proceeded to testify he believed defendant Gholson was a sociopath "at the very end of the scale in terms of severity" and, if given the chance, he would commit acts of criminal violence that would be a threat to society.

As a result of the jury's findings—including an affirmative finding that defendants would probably commit future criminal acts of violence that would constitute continuing threats to society—defendants were sentenced to death.

## II. *Constitutional Violations*

There is no doubt this Court and the Supreme Court recognize the death penalty as a qualitatively different form of punishment than any other that can be imposed. *Gregg v. Georgia*, 428 U.S. 153, 185, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976); *Smith*, 602 F.2d at 699 *citing Gardner v. Florida*, 430 U.S. 349, 357, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977). It is different from all other punitive measures in that it is the most severe and exacting disciplinary mechanism available to a society that considers itself civilized and decent. In addition, the termination of human life is the most final and decisive method for inflicting a penalty that can be conceived. It is precisely the inflexible and terminal nature of the death penalty that makes it a matter of exceeding consequence to assure that before such a condemnation is made the individual receives the full force of the protections and safeguards guaranteed by the Constitution.

In this case, the district court did not err in holding defendants Gholson and Ross were sentenced to die without receiving the full benefit of those valuable safeguards.

---

1. Texas law provides for a bifurcated system in capital cases. Initially, the trier of fact determines whether the defendant is guilty or innocent of the crime for which he is charged. If he is convicted, the court must hold a hearing immediately, before the same jury, to decide whether the defendant is to be sentenced to life imprisonment or put to death. The State has the burden of proving the matters relevant to the punishment beyond a reasonable doubt.

The jury's final determination is obtained by receiving answers to three interrogatories. If a unanimous jury answers all three of the questions in the affirmative, the judge must impose a death sentence. The three questions are (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and (3) whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased. Tex.Code Crim.Proc. Ann. art. 37.071 (Vernon Supp.1978).

This bifurcated system was upheld as constitutional in the case of *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The second interrogatory is the only one involved in this appeal.

## A. Due Process Violations

This Court, together with the subsequent affirmation by the Supreme Court in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), essentially decided the case *sub judice* in the case of *Smith v. Estelle*. In *Smith*, this Court relied in great part on the Supreme Court case of *Gardner v. Florida, supra*. As was recognized in *Smith*, the *Gardner* Court reversed a death sentence because it was based in part on information that was not disclosed to defendant or his attorneys.

The *Gardner* Court balanced the benefits of withholding the information against the costs, and concluded that any benefits were outweighed by the damage to the reliability of the information. The reduced reliability resulted from the denial of the " 'opportunity for ... explanation or argument by defense counsel,' and for 'counsel to challenge the accuracy or materiality of [the] information.' " *Smith*, 602 F.2d at 699 *citing Gardner*, 430 U.S. at 356, 362, 97 S.Ct. at 1204, 1206.

■ This Court is compelled to the same conclusion it reached in *Smith*. "The defect which the Supreme Court identified in *Gardner* ... is conspicuous here as well. As a result, [Gholson's and Ross'] sentencing hearing[s] [were] at least as unreliable as the proceedings in *Gardner*." *Smith*, 602 F.2d at 699. The defect is that defendants—at the punishment phase of their trials—were confronted and surprised by the doctors' testimony. Defendants' ability to

question or challenge the veracity of the very testimony that served as the groundwork for their being condemned to die was inhibited, if not denied. Defense counsel were not notified that Dr. Holbrook was to examine or had examined defendants at all. In addition, defendant Gholson's attorney received no notice that Dr. Grigson was to examine his client for any purpose other than to determine his sanity.[2] The record indicates that as a result of this lack of notice, defense counsel were thwarted in their effort to conduct a meaningful cross-examination of the doctors.

This surprise strikes at the heart of the adversary system of justice. The system is meant to eliminate surprise and to help illuminate the presentation of reliable evidence necessary to the " 'determination that death is the appropriate punishment in a specific case.' " *Smith*, 602 F.2d at 703 *quoting Woodson v. North Carolina*, 428 U.S. at 305, 96 S.Ct. at 2991. The question of whether life should be taken "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. at 189, 96 S.Ct. at 2932. If a person is to be executed, it should be as a result of a decision based on reason and reliable evidence—not as a result of ambush.

Because defendants were surprised, this Court again deals "with testimony offered by one party and not effectively cross-examined by the other; it carries no assurance of reliability whatever." *Smith*, 602

---

2. The state habeas court found that defense counsel had notice in advance of trial that Dr. Grigson and Dr. Holbrook would testify in the punishment phase of both defendants' trial. There is no support for this finding in the trial record other than the subpoena calling Dr. Holbrook as a witness. There is no showing that defense counsel were aware of the subpoena. In any event, the subpoena does not indicate for what reason Dr. Holbrook was being called to testify.

The record, however, is replete with discussion by counsel and the state court that the only purpose of any psychiatric examination—and specifically the examination by Dr. Grigson—would be to determine competency.

The results of a competency examination are used for a qualitatively different purpose than

are the results of an examination to determine future dangerousness. The State's use of the results of a competency examination does not facilitate the proof of factors necessary to impose a criminal punishment. Of course, the results of an examination of a defendant's future dangerousness are used—and specifically elicited—to facilitate the imposition of the harshest criminal punishment possible. *See Battie v. Estelle*, 655 F.2d 692, 701 (5th Cir. 1981).

The district court obviously exercised caution and conducted a thorough examination of the trial court record. As a result, there was no error in refusing to adopt the erroneous finding of the state habeas court.

F.2d at 701. Since defendants' sentences were constitutionally defective, this Court affirms the district court judgment setting aside the sentences of death.

### B. *Fifth and Fourteenth Amendment Violations*

█ The controversy involving the fifth amendment[3] in this case appears to be two-fold. First, there is a question of whether defendants were entitled to a *Miranda* warning.[4] 384 U.S. at 436, 86 S.Ct. at 1602. Second, there is a question of whether the fifth amendment was violated as a result of the fact defendants' elections to remain silent served as a basis for their being condemned to die. This Court determines first that defendants were entitled to a *Miranda* warning, since the doctors' testimony regarding their conclusions was based upon content based communications. In addition, this Court determines that defendants' fifth amendment rights were violated because their decision to exercise their constitutional right served as the groundwork for their being sentenced to die.

The State argues defendants were not entitled to a *Miranda* warning because the doctors' examinations and findings were based upon physical, nontestimonial communications. The State attempts to equate the examinations performed by Drs. Holbrook and Grigson with voice examplars, the taking of blood, and cases of a like nature. The State's reliance on these cases involving physiological communications is misplaced.[5]

---

**3.** There is no doubt the fifth amendment is applicable to the punishment phase of a trial as well as to the guilt-innocence phase. As the Supreme Court stated in *Estelle v. Smith*, "We can discern no basis to distinguish between the guilt and penalty phases of the respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned." 101 S.Ct. at 1873. This same reasoning compelled this Court to conclude in *Smith* that "at the sentencing phase of a capital trial, Texas may not use evidence based on a psychiatric examination of the defendant unless the defendant was warned, before examination, that he had a right to remain silent; was allowed to terminate the examination when he wished; and was assisted by counsel in deciding whether to submit to the examination." 602 F.2d at 709. In addition, this Court recently held that "a custodial interrogation performed by a court-appointed psychiatrist used to establish an element of proof necessary to support the imposition of capital punishment must be preceded by a warning sufficient to advise a capital defendant of his fifth amendment privilege where the defendant has neither requested the examination nor introduced psychiatric evidence on the issue of future dangerousness." *Battie*, 655 F.2d at 698 *citing Estelle v. Smith*, 101 S.Ct. at 1875–76.

There can be no doubt that the examinations conducted by Drs. Grigson and Holbrook were custodial interrogations. The doctors "went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of [defendants'] future dangerousness, [their] role[s] ... [were] essentially like that of an agent of the State recounting unwarned [examinations] made in a post-arrest custodial setting. During the psychiatric evaluation, respondent[s] assuredly [were] 'faced with a phase of the adversary system' and [were] 'not in the presence of ... person[s] acting solely in [their] interest.'" *Estelle v. Smith*, 101 S.Ct. at 1875 *citing Miranda v. Arizona*, 384 U.S. 436, 469, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694 (1966).

This Court held in *Battie* that the Supreme Court's decision in *Estelle v. Smith* must be given retroactive effect. 655 F.2d at 699. Accordingly, the decision in *Estelle v. Smith* controls the case *sub judice*. Of course, the fifth amendment is applicable to the states by virtue of the fourteenth amendment. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

**4.** The record indicates defendant Ross was advised by Dr. Holbrook of his right to remain silent, and Dr. Holbrook continued to question him in the face of defendant Ross' silence. The record does not inform this Court as to whether defendant Gholson was advised of his rights prior to being examined by Dr. Holbrook. The district court was correct in concluding, however, that when the privilege against self-incrimination applies, the state has the burden of showing the accused was advised of his privilege, and waiver of the privilege may not be inferred from a silent record. *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628.

**5.** The State attempts to avoid the unequivocal holdings of the Supreme Court and this Court that "[t]he fact that [a defendant's] statements were uttered in the context of a psychiatric examination does not automatically remove them from the reach of the Fifth Amendment" when the results of that examination are used by the State for a purpose that is plainly adverse to a defendant. *Estelle v. Smith*, 101 S.Ct. at 1874; *Battie*, 655 F.2d at 698.

Initially, there is evidence the doctors' examinations and findings were content-based, involving more than mere physiological reactions. Both doctors testified that the examinations they conducted were "mental status" examinations. Dr. Holbrook testified, upon voir dire examination of the physician, that his opinion was based in part upon what defendants said to him in answer to his questions. He further testified that he could not reach a valid conclusion by just sitting and looking at a person who did not say anything. In other words, Dr. Holbrook's conclusions were based upon what defendants said. Dr. Grigson testified that one of the phases of his mental status examination is called the "content of thought" stage. In this stage, Dr. Grigson testified, it is "of particular importance where you have an individual that is charged with crime is the ability of that individual to discuss what they were doing on or around about the time that the alleged offense took place."

Additionally, while the "content" of a communication includes what the person says, it also includes, as a matter of necessity, what is not said. This proposition was recognized in *Smith* when this Court held that Dr. Grigson's diagnosis of future dangerousness was based "on comments Smith made *and failed to make* while he was recounting the crime." 602 F.2d at 704. (emphasis added). This Court concluded, "Plainly, then, Dr. Grigson—and therefore the prosecution, when it called him as a witness—used the content, not the non-testimonial aspects of Smith's statements." *Id.* The Supreme Court described its conclusion only slightly differently when it stated, "Dr. Grigson's prognosis as to future dangerousness rested on statements respondent [Smith] made, *and remarks he omitted* . . . ." *Estelle v. Smith*, 101 S.Ct. at 1873 (emphasis added).

Defendants were not allowed to refuse the examinations by Drs. Holbrook and Grigson. Defendant Ross was questioned even in the face of his silence. Both doctors testified that defendants exhibited a lack of remorse, which was a quality, the doctors testified, indicating a sociopathic

tendency. In fact, Dr. Holbrook testified: "Now, the person who doesn't tell me anything but indicates he understands his rights not to say anything so he won't be punished indicates to me that he is not feeling just a whole lot of guilty [sic] if any at all . . . ." Dr. Holbrook also stated defendant Ross' silence indicated a lack of remorse even if "he was told by his attorney" to remain silent.

■ There is evidence the doctors' conclusions were based upon the substance of defendants' disclosures during the pretrial psychiatric examination. Initially, there is evidence the doctors based their diagnoses on what defendants said. In addition, the doctors admittedly relied upon defendants' silence regarding their guilt or innocence in reaching their conclusions. As a result, defendants were entitled to a *Miranda* warning.

■ In addition to this evidence, and assuming the validity of the State's position that only physiological reactions were evaluated, the physiological reactions elicited from defendants were, by themselves, testimonial in nature, requiring that defendants receive a *Miranda* warning. This Court recognizes the fifth amendment is not violated if a defendant's testimonial capacities are in no way implicated. The fifth amendment simply is not involved in cases in which the prosecution relies solely upon physiological reactions and there is "[n]ot even a shadow of testimonial compulsion upon or enforced communication by the accused." *Schmerber v. California*, 384 U.S. 757, 765, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966). In the case at bar, however, defendants' testimonial capacities—although arguably only physiological—were implicated.

The type of examination employed in this case is aimed at procuring evidence by measuring physical behavioral reactions to interrogation. This case does not present the kind of situation referred to by this Court in *Smith* when it indicated that "[h]ad Dr. Grigson drawn his conclusion from Smith's manner or deportment, his attention span or facial expressions, a strong argument

might be made that he gathered only evidence like that involved" in cases such as those involving a defendant's being compelled to wear a piece of clothing, give a blood sample, or a handwriting or voice examplar. 602 F.2d at 704. A neutral and detached observation of a person's physiological characteristics is something altogether different from an examination directed at and calculated to subtly extract a defendant's thoughts by way of a prosecution psychiatrist's analysis of the defendant's physical responses and reactions to questions.

Dr. Holbrook explained his approach by stating, "noting immediately his [defendant Ross'] silence, that he was not in all probability going to begin to answer my questions, I had to then shift gears into making some assessment of his reactions to me and my questions, and in the penitentiary we call this catching the dummy." He later testified that he based his diagnosis on his examination of defendant Ross and "the way he reacted to me in not answering." Dr. Holbrook proceeded to characterize defendant Ross' reactions to his questions as the equivalent of the "production of thought" that could be obtained if defendant Ross had talked to him. When interrogation is meant to produce certain reactions, whether they are willed reactions or not, the history and spirit of the fifth amendment is summoned to safeguard the rights of a defendant. *See Schmerber*, 86 S.Ct. at 1832.

It should be noted the State argues it was not constitutional error to introduce Dr. Grigson's testimony, since it was impeach-ment evidence and the Supreme Court has allowed evidence obtained in violation of *Miranda* to be introduced for the purpose of impeachment. *See Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The testimony of Dr. Grigson, however, was not for the purpose of "impeachment" as that term is defined by the holding in *Harris*. In the case *sub judice*, Dr. Grigson's testimony was introduced as evidence to contradict the testimony of defendant Gholson's doctor. The rule allowing the introduction of evidence obtained in violation of the fifth amendment contemplates the introduction of such evidence to impeach a defendant who has chosen to testify in his own behalf.[6] *See Id.*

Beyond entitlement to a *Miranda* warning, the State's utilization of defendants' silence, standing alone, necessarily violated their fifth amendment rights.[7] Defendants Ross and Gholson maintained silence regarding their guilt or innocence in response to questions about crimes for which they had been charged. Both defendants had entered pleas of not guilty to the offenses charged. The defendants in this case, as in every criminal case, were under no duty to confess guilt. The State, however, by placing defendants in a no win situation, attempts to force them to speak their guilt by silence. Applying the State's reasoning, a defendant could tell the state's psychiatrist he is guilty of the crime for which he is accused and ostensibly avoid the possibility of death, since he arguably exhibits remorse. On the other hand, a defendant could invoke his constitutional privilege to remain silent, requiring the State to meet

---

**6.** This Court in *Smith* reserved the question of whether a defendant who agrees to be examined by a psychiatrist of his own choosing and calls that psychiatrist to testify waives his fifth amendment privilege. Once again, this Court does not have to address the issue, since defendant Gholson was never made aware of the possibility that Dr. Grigson might testify in the punishment phase of his trial. It is enough to determine that without this vital information, defendant Gholson could not make an educated and well reasoned determination concerning whether it would be advantageous to present his own psychiatrist's testimony.

**7.** This appears to be precisely the type of case about which the Supreme Court expressed concern and fear when it stated, "While recognizing that attempts to coerce a defendant to submit to psychiatric inquiry on his future dangerousness might include the penalty of prosecutorial comment on his refusal to be examined, the Court of Appeals noted that making such a remark and allowing the jury to draw its own conclusions 'might clash with [this Court's] insistence that capital sentencing procedures be unusually reliable.'" *Estelle v. Smith*, 101 S.Ct. at 1875 n.11 *citing Smith*, 602 F.2d at 707.

the burden of proof it faces when attempting to demonstrate guilt, and then face the possibility of death because he arguably fails to exhibit remorse.

The essence of the fifth amendment is "the requirement that the state which proposes to convict *and punish* an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Estelle v. Smith*, 101 S.Ct. at 1872 *quoting Culombe v. Connecticut*, 367 U.S. 568, 581–82, 81 S.Ct. 1860, 1867, 6 L.Ed. 1037 (1961) (emphasis in original). By the same token, the state proposing to execute an individual must produce the evidence against him by some means other than his choosing to exercise his constitutional right to remain silent.

■ The fifth amendment privilege is " 'as broad as the mischief against which it seeks to guard.' " *Estelle v. Smith*, 101 S.Ct. at 1875 *quoting Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892). As a result, "the privilege is fulfilled only when a criminal defendant is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence.' " *Estelle v. Smith*, 101 S.Ct. at 1875 *quoting Malloy v. Hogan*, 378 U.S. at 8, 84 S.Ct. at 1493 (1964). Since death is the most extreme penalty that can be imposed in any case, it necessarily follows that the decision to exercise the constitutional privilege to remain silent should not serve as the foundation for sentencing the decision maker to die.

■ The State argues that defendant Ross waived his right to complain about Dr. Holbrook's conclusions regarding Ross' remorse, since Ross raised the issue himself during the cross-examination of Dr. Holbrook. This argument is not well founded. A defendant has a basic right to confront a witness, a doctor, that is telling the jury he is a sociopath capable of committing criminally violent acts in the future. A defendant has a basic right to confront such a witness to discern how and why the doctor reached his conclusions.

■ In the case *sub judice*, the doctors based their conclusions upon defendants' failure to repent at a time when they both had pled not guilty to the crimes charged. The doctors' conclusions were based upon defendants' failure to admit guilt at a time when the fifth amendment secured the defendants' privilege not to incriminate themselves. The doctors were testifying regarding determinations they had made at a time when the State still had the burden of proving defendants were guilty of any wrongdoing. Although the doctors' testimony regarding defendants' future dangerousness occurred in the punishment phase of the trial, and after the State had met its burden of proof relating to a defendant's guilt, the fact remains the doctors' conclusions were reliant upon constitutionally infirm evidence. A valid sentence of death cannot be based upon such testimony.

Once again, the State wishes to place defendants in a "heads-I-win, tails-you-lose" position. A reasonably intelligent prosecutor could fashion his case around constitutionally infirm evidence, but just not question his doctor in a way that will demonstrate the psychiatrist's testimony and conclusions are based upon the defendant's exercise of a constitutional right. A defendant would then be permitted to confront his accuser and explore the basis for his appraisal. However, according to the State's reasoning, the result of such confrontation would be the lost opportunity to challenge the fact his fifth amendment rights were violated. A defendant cannot waive his constitutional rights merely by exposing their violation.

Defendants' fifth amendment rights were violated. The district court did not err in striking down defendants' respective death sentences.

### C. *Sixth and Fourteenth Amendment Violations*

■ This Court holds defendants' sixth amendment rights to counsel were violat-

ed.[8] At the time of the examinations, defendants had been indicted, appointed counsel, and pled not guilty. Defendants were not allowed to consult with their attorneys before Dr. Holbrook performed his examination. The record reflects that defense counsel were given no indication or notification that Dr. Holbrook was to examine defendants at all, and counsel were not informed that Dr. Grigson was to examine defendant Gholson for any reason other than to determine whether he was sane.

The facts of *Smith* are strikingly similar. In that case, defense counsel were not notified of the examination by Dr. Grigson, and Dr. Grigson's name was omitted from a list of witnesses that the prosecution was required to furnish to the defense. As a result of such actions, this Court in *Smith* held that the trial judge

> overlooked the role that an attorney might have played in helping a client like Smith decide whether he wished to submit to an examination. This is a vitally important decision, literally a life or death matter. It is a difficult decision even for an attorney; it requires a knowledge of what other evidence is available, of the particular psychiatrist's biases and predilections, of possible alternative strategies at the sentencing hearing. For a lay defendant, who is likely to have no idea of the vagaries of expert testimony and its possible role in a capital trial, and who may well find it difficult to understand, even if he is told, whether a psychiatrist is examining his competence,

his sanity, his long-term dangerousness for purposes of sentencing, his short-term dangerousness for purposes of civil commitment, his mental health for purposes of treatment, or some other thing, it is a hopelessly difficult decision. There is no reason to force the defendant to make it without the "guiding hand of counsel." [9]

*Smith*, 602 F.2d at 708–09 *quoting Powell v. Alabama*, 287 U.S. 45, 57, 53 S.Ct. 55, 59, 77 L.Ed. 158 (1933). The Supreme Court emphasized this holding in *Estelle v. Smith*, 101 S.Ct. at 1877. There can be no doubt a defendant in a criminal case has a constitutional right to be assisted by counsel in deciding whether to submit to a psychiatric examination, the results of which the State of Texas seeks to introduce as evidence in the sentencing phase of a capital trial.[10]

IV. *Conclusion*

It is beyond peradventure that at the sentencing phase of a capital trial, Texas may not use evidence of the defendant's future dangerousness based upon a psychiatric examination of the defendant unless the defendant has been warned, before the examination, that he has a right to remain silent. If a defendant indicates he wishes to remain silent, he may not be questioned for the purpose of determining his future dangerousness. He must also be warned that he is allowed to terminate the examination when he wishes. Finally, he must be assisted by counsel in deciding whether to submit to the specific examination. Defendants Gholson and Ross were denied these rights.[11] It is for this reason their death sentences were set aside by the

**8.** The sixth amendment is applicable to the states by virtue of the fourteenth amendment. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1964).

**9.** This analysis pierces the heart of the State's argument that defendants' sixth amendment rights might not have been violated since defense counsel in the case *sub judice* may have counselled their clients in a general sense regarding the possibility of future psychiatric examinations. The sixth amendment's protection contemplates more than a casual discussion between attorney and client regarding the vague possibility that the client may be examined at some indefinite time in the future for

the purpose of aiding in the determination of whether he should be executed.

**10.** It should be noted that this Court in *Smith* held that a defendant has no constitutional right to have an attorney present *during* the psychiatric evaluation of his dangerousness. 602 F.2d at 708.

**11.** The State of Texas contends this case should be remanded to the district court in order to allow an evidentiary hearing on the issues of fact relevant to defendants' constitutional claims. The State argues that such a hearing might uncover pertinent evidence that will demonstrate defendants' constitutional rights were somehow preserved.

district court.[12] The judgment of the district court is affirmed.

AFFIRMED.

DYER, Circuit Judge, specially concurring:

I concur in the judgment of affirmance because it clearly appears that the admission of Dr. Holbrook's psychiatric opinion testimony against both Gholson and Ross violated each petitioner's fifth and sixth amendment rights. *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

I came to this decision with serious reservations. There is no doubt that Gholson

---

This Court does not find merit in the State's position. The State of Texas has never offered to show any specific facts that would contradict the trial court record. During trial, defense counsel objected to the use of the State's psychiatrists as witnesses in the punishment phase of the trial. This objection was lodged early. During the initial discussion of whether Dr. Grigson should be appointed to examine defendants to determine sanity, defendant Gholson's counsel stated,

In this case there is an ultimate question as to whether or not the defendant could be rehabilitated. Through this examination, I am sure such information could be acquired by the State's psychiatrist whether or not he felt in his opinion this man could be rehabilitated. This we feel would infringe upon his rights for self-incrimination.

At the time the State attempted to elicit the challenged testimony from the doctors, defense counsel objected. *See also Smith*, 602 F.2d at 708 n.19. The State, however, never attempted to elicit any testimony that would illuminate the extent, detail, or sufficiency of the alleged protection of defendants' fifth and sixth amendment rights.

Additionally, the State failed to demonstrate such facts when faced with defendants' motions for summary judgment. Indeed, the State of Texas failed to respond to the motions for summary judgment in any manner. The only objection to a summary judgment came subsequent to the district court's granting of the motions. At that time, the State moved the district court to reform the judgment. Even in this motion, the State failed to show any specific facts that would contradict the trial court record. In fact, the State relied upon the trial court record to erroneously argue the judgments should be reformed as to the fifth amendment issues due to defendants' alleged failure to make proper objections.

The State also argues that because defendants did not support their motions for summary judgment with affidavits the motions should be treated as motions for judgment on the pleadings. This argument is an attempt to avoid the consequence of failing to supply appropriate opposing affidavits regarding pertinent facts. This argument is erroneous, however. Fed.R. Civ.P. 56, which controls summary judgments, does not require that a motion for summary judgment be accompanied by supporting affidavits. To the contrary, Rule 56 is permissive and expressly allows a motion for summary judgment without supporting affidavits.

In addition, the State's argument ignores the provisions of Fed.R.Civ.P. 12(c), which controls motions for judgments on the pleadings. Rule 12(c) states, "If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Among other matters outside the pleadings, the transcript of the state trial court was presented to the district court. The point to be made is that had defendants expressly moved for judgment on the pleadings the motion nevertheless would have been treated as a motion for summary judgment. Accordingly, the State, pursuant to Fed.R.Civ.P. 56(c), had the opportunity to file opposing affidavits.

Even assuming a party is otherwise entitled to supplement the record in a habeas corpus case at this late date, this Court determines a remand in the case *sub judice* would be inappropriate. The State simply has never attempted to contradict a state trial court record that was before the district court and, when reviewed, reveals no genuine issue of material fact. *See Battie*, 655 F.2d at 703 n.24. The State of Texas has been accorded a fair and complete opportunity to adduce evidence in state court and to adduce appropriate summary judgment evidence in the federal district court. No party should be put to the wasteful exercise of repetition by remanding this case to the district court for an evidentiary hearing. *See Guice v. Fortenberry*, 661 F.2d 496, 500 (5th Cir. 1981).

12. This Court understands the decision of the district court does not undermine defendants' convictions. The district court's judgment holds only that defendants cannot be put to death. It is with this understanding that the judgment of the district court is affirmed. This Court leaves to the appropriate authorities of the State of Texas the decisions regarding the method for proceeding in those instances, such as the case *sub judice*, in which the state cannot legally execute a defendant it has sentenced to die.

and Ross committed cold blooded, premeditated murder, prompted by hate, and preceded by brutal violence on helpless and defenseless victims who were unknown to the assailants.

While I firmly believe that the jury would have imposed the death penalty on each petitioner in the absence of the psychiatric testimony because of the outrageous circumstances of petitioner's heinous crimes, I cannot say, as Texas urges, that we can conclude that the constitutional errors were harmless beyond a reasonable doubt.